**In re FIRST SOFTWARE,
CORPORATION, Debtor.**

**Bankruptcy No. 86–10560–JNG.**

United States Bankruptcy Court,
D. Massachusetts.

Sept. 30, 1987.

Choate Hall & Stewart, for debtor.

Hale and Dorr, for Creditors' Committee.

**MEMORANDUM**

JAMES N. GABRIEL, Chief Judge.

The matters before the Court are the fee applications of Choate, Hall & Stewart and Hale and Dorr.

**I**

Section 330(a) of the Bankruptcy Code provides that an attorney is entitled to reasonable compensation for actual, necessary services based on the nature, the extent, and the value of such services, and the cost of comparable services outside of bankruptcy, as well as to reimbursement for actual and necessary expenses. 11 U.S.C. § 330(a). Pursuant to 11 U.S.C. §§ 327–330 and Bankruptcy Rules 2016 and 2017 and Local Bankruptcy Rule 32, "the court has an independent judicial responsibility to evaluate attorneys' fees .. [that] ... is especially acute when the attorney seeks compensation from the bankruptcy estate." *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 831–32 (Bankr.D.Vt.1987) (citations omitted).

The Court's review of a fee application begins with a determination of the accuracy of the arithmetic and proceeds to an evaluation of whether services are sufficiently identified and explained. "[A]t the very least, every fee application must have a specific analysis of each task for which compensation is sought." *In re WHET, Inc.*, 58 B.R. 278, 282 (Bankr.D.Mass.1986). As the court in *In re S.T.N. Enterprises, Inc.* recently stated, the burden is on the attorney applying for legal fees to establish the reasonableness of the fees, 70 B.R. at 832, and "[t]he test of the sufficiency of an application for attorneys' fees is whether, standing alone, the application identifies, describes and explains the services and expenses charged to the estate intelligibly enough to enable ... [the Court] to evaluate their reasonableness." *Id.* at 834–35. Moreover, to be compensable, services must benefit the estate. *Id.* at 839.

Judge Conrad, in *S.T.N. Enterprises*, exhaustively examined the plethora of bankruptcy cases on the subject of attorneys' fees. A summary of what is required in

fee applications, according to Judge Conrad, follows:

1. *Activities* (e.g., court appearances)

"The applicant should describe the factual particulars and the subject matter, and delineate the relationship of the activity to the estate, the purpose of the activity, and the results for the estate." *Id.* at 833.

2. *Meetings, Conferences, Correspondence and Telephone Calls*

"Items such as meetings, conferences, correspondence, and telephone calls should identify the participants, describe the substance of the communication, explain its outcome, and justify its necessity.... Correspondence and other documents referred to in the application should be identified by the date, the author and the subject matter." *Id.*

3. *Negotiations*

"[T]ime for negotiations should identify who was involved, describe the subject matter of the dispute, explain the relationship to the bankruptcy, and recite the results." *Id.*

4. *Legal Research*

"[T]he applicant should identify each specific issue, and should explain why this issue needed to be researched and what use was made of the research in the bankruptcy case." *Id.*

5. *Preparation and Review of Legal Papers*

"[T]he applicant should clearly identify the document involved and specify the work performed, such as outlining, drafting, revising, cite checking, proof reading, photocopying or indexing." *Id.*

With respect to expenses, the applicant must substantiate the need for each item of expense and must establish that a less expensive alternative was properly rejected. *Id.* at 834.

 While this Court believes the standards enunciated by Judge Conrad are well worth striving for, the Court recognizes their stringency and would not penalize an applicant for every instance where, for example, an activity was not thoroughly justified or described in minute detail. Indeed Judge Scholl of the Eastern District of Pennsylvania, while acknowledging Judge Conrad's "remarkably detailed opinion" doubts that courts with much larger case loads would have time to digest fee applications with the specificity of contents demanded by Judge Conrad. *See In re National Paragon Corp.*, 74 B.R. 858, 863–64 (Bankr.E.D.Pa.1987). This Court agrees that such specificity might not be warranted in all cases. For example, meticulous detail might be unwarranted in very small proceedings of brief duration or proceedings resulting in payment of 100% of allowed claims or proceedings in which counsel charge a modest hourly rate compared to prevailing rates. Of course, the Court would reserve the right to demand more specificity in instances where it deemed more detail appropriate. Nevertheless, at a minimum, the narrative statement accompanying the computer printouts or listings of activities must indicate how categories of services performed benefit the estate and if there was no net benefit, the reasons for such a failure.

When Choate, Hall & Stewart ("CH & S" or the applicant) and Hale and Dorr's fee applications are measured by the standards just described, it is clear that the applications, particularly the computer printouts accompanying them, are inadequate and do not enable the Court to easily and quickly compute the lodestar and to evaluate the reasonableness of the fees charged for the services rendered.

The Court of Appeals for the First Circuit in *Boston and Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985), spelled out the procedure for computing the lodestar. That procedure involves the establishment of a lodestar or threshold point of reference and then the upward or downward adjustment of the lodestar based upon a variety of factors. *Id.* at 7. These factors include: 1) the time and labor required; 2) the novelty and difficulty of the questions involved; 3) the skill necessary to properly perform the legal services; 4) the preclusion of other employment by the attorney or firm due to acceptance of the case; 5) the customary fees charged; 6) whether the fee is fixed or contingent; 7) time limi-

tations imposed by the court or the client; 8) the amount of money involved in the case and the results obtained; 9) the experience, reputation, and ability of the attorney; 10) the undesirability of the case; 11) the nature and length of the professional relationship between the attorneys or firm and the client; and 12) fee awards in similar cases. *Id. See also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *Matter of Fleeman*, 73 B.R. 579 (Bankr.M.D.Ga.1987). Certainly not all of these factors are applicable to the fee applications before the Court. To the extent that there are applicable factors, the Court will discuss them in the following sections.

## II

As counsel to the Debtor, the firm of Choate, Hall & Stewart advised and represented the Debtor in all its legal matters during the Chapter 11 proceeding that commenced on April 19, 1986. The applicant did so until it was replaced, with the permission of the Court, by the firm of Foley, Hoag & Eliot, following confirmation of the Debtor's plan of reorganization. Twenty-two lawyers and 13 paralegal clerks from CH & S performed legal and paralegal services for the Debtor at hourly rates ranging from $40 per hour to $225 per hour. The applicant filed with the Court three Applications for Allowance of Compensation and Reimbursement of Expenses. The first application was filed on January 9, 1987, the second was filed on February 17, 1987, and the final application was filed on June 4, 1987. CH & S, in each of the three applications, utilized 18 separate categories to consolidate and summarize the types of services it performed for the Debtor. CH & S provided the Court with a brief description of the types of services it provided in each category, as well as a listing of the attorneys and paralegals performing work in that category, the number of hours they worked, their rates and the total fee requested for services performed in each category. However, except in a few instances, the applicant did not indicate the net benefit to the estate from the services it provided.

### A. General Administration

### B. Creditors' Committee

The Court will consider the first two categories, "General Administration" and "Creditors' Committee" together. In these two categories, CH & S employed 15 attorneys and nine paralegals who together expended a total of 867.25 hours. The applicant includes within these two categories such matters as the review of secured and priority claims, telephone calls and correspondence with creditors, the review of the fee applications of other functionaries in the case, and organization of files and revisions of schedules and matrices. The applicant also includes time spent to implement "an extensive program" of communication with the creditors' committee in the "Creditors' Committee" category. The Court, parenthetically, is puzzled at the need for 79 attorney hours and 14.25 paralegal hours to establish this liaison. Nevertheless, the estate is billed for a total number of 960.50 hours for undertakings in these two categories, and the applicant requests compensation in the amount of $94,855.50 for its services.

### C. Receivables/Collection Program

The applicant employed seven attorneys and seven paralegals in this category that involved three separate adversary proceedings to collect accounts receivable from Macy's New York, Inc., Bamberger's and Lechmere, Inc. Together, the attorneys and paralegals expended a total of 428.95 hours for which CH & S requests compensation in the amount of $43,342.50 for services "primarily done by mid-level or junior lawyers and paralegals." The Court notes that 212.45 hours were spent by counsel charging from $120 to $195 per hour; 91.4 hours by counsel charging $95 per hour; 16 hours by counsel charging from $65 to $75 per hour; and 92.35 hours by paralegals charging from $40 to $60 per hour. The Court does not know whether to express surprise or ignorance in finding lawyer time being charged at $65 per hour and paralegal time being charged at $60 per hour.

### D. Financing

The applicant employed six attorneys and one paralegal in this category that involved assisting the Debtor with its urgent need for post-petition financing. The attorneys and paralegals expended a total 175.4 hours for which the CH & S requests compensation in the amount of $27,465. Notably, five attorneys charged from $145 to $225 per hour; one attorney spent one-half hour at $120 per hour and one paralegal spent one-half hour at $55 per hour.

### E. Preference Program

The applicant employed six attorneys and three paralegals in this category. Together, they expended a total of 223.9 hours. The applicant requests compensation in the amount of $20,414 for work performed in this category. CH & S does not indicate the amount of preference recoveries it obtained for its expenditure of time, and the Court notes that the disbursing agent appointed pursuant to the Debtor's confirmed plan of reorganization is now pressing preference claims. Nevertheless, the January 1987 application indicates that investigations were conducted and two suits were commenced, one of which was dismissed by agreement. A discovery motion was filed in the second action. The applicant states that "almost all of the work on preferences was done by junior lawyers and paralegals." The Court notes that 93.8 hours were spent by attorneys billing from $95 to $195 per hour, while 130.1 hours were spent by attorneys and paralegals whose rates range from $40 to $85 per hour. The Court further notes that 75 of the 130.1 hours were billed by paralegals charging $60, $65 or $70 per hour.

### F. Management Restructuring

The applicant employed six attorneys and one paralegal in this category that involved resolving various termination and indemnification agreements with former stockholders and senior managers of the Debtor. The attorneys and paralegals expended a total of 23.1 hours of time in this category. The applicant requests compensation in the amount of $3,187.75. Twenty hours were spent by attorneys charging from $95 to $195 per hour; 2.1 hours were spent by an attorney billing $85 per hour, and one hour was spent by a paralegal billed at $40 per hour.

### G. Leases

CH & S employed four attorneys and two paralegals who expended a total of 103.65 hours on work related to the rejection of the Debtor's real property lease in California and the renegotiation of its real property lease in Methuen, Massachusetts. The applicant requests compensation in the amount of $14,897.50 for work performed in this category. Eighty-seven and $4/10$ hours were billed by attorneys billing from $135 to $195 per hour; 9.75 hours were billed by an attorney billing $85 per hour and 6.5 hours by paralegals billed at $40 or $45 per hour.

### H. Sale of Assets

During the course of its Chapter 11 proceeding, the Debtor sold obsolete and excess inventory, excess data processing equipment and automobiles, realizing, in the process, approximately $925,000 in cash. The applicant employed four attorneys and two paralegals in this category. These individuals spent a total of 54.9 hours on tasks related to these sales. The applicant requests compensation in the amount of $4,496 for their time. Fourteen and $5/10$ hours were billed by attorneys charging from $95 to $195 per hour; 31.65 hours by attorneys billing from $65 to $85 per hour; and 8.75 hours for paralegals billed at $40 to $50 per hour.

### I. First Reflex

First Reflex, Ltd. is an English Company in which the Debtor had a financial interest. The Debtor sold its interest in First Reflex for $680,000, the release of substantial obligations owed by the Debtor and the receipt of warrants to purchase up to 8% of First Reflex. CH & S employed four attorneys and one paralegal who together spent a total of 44.5 hours consummating the sale. The applicant seeks compensation in the amount of $7,068.75 in this category. Forty-three and $25/100$ hours were spent by attorneys billing from $120 to $195 per hour and 1.25 hours was spent by a paralegal billed at $45 per hour.

### J. Plan of Reorganization/Disclosure Statement/Confirmation

The applicant employed six attorneys and two paralegals in this category. These individuals spent a total of 460.7 hours negotiating and drafting disclosure statements and plans, as well as preparing liquidation analyses and projections. Time spent in this category also reflects the applicant's filing of a complaint and a Motion for a Temporary Restraining Order, to assure consummation of the confirmed plan when the funder of the plan, First Trade and Finance Corporation, threatened to breach its agreement to provide funds. The applicant seeks $60,145.25 for work performed in this category. Three hundred and seventy-nine and 45/100 hours were billed by attorneys charging $95 to $195 per hour; 12.5 hours were billed by an attorney charging $75 per hour; and 19.5 hours were billed for paralegals with rates from $45 to $65 per hour.

### K. Tax Matters

The applicant employed six attorneys to resolve a number of issues with the Massachusetts Department of Revenue. The applicant seeks compensation in the amount of $13,217.50 for the 101 hours expended by the six attorneys. Forty-four and 75/100 hours were billed at $75 per hour, and 56.25 hours were billed by attorneys charging from $95 to $215 per hour. Only 2.5 hours were billed at $95 and the balance was billed at rates between $145 and $215 per hour.

### L. Volume Purchase Agreements

The applicant employed six attorneys who expended a total of 36.3 hours on work performed in this category. CH & S seeks compensation in the amount of $6,297.50. Except for 1.25 hours billed at $95 per hour, the total remaining time in this category was billed at $175. Although CH & S initially assisted the Debtor in attempting to negotiate volume purchase agreements, none materialized and a party in interest eventually set up an intermediary for such transactions while counsel to the Debtor looked on and advised.

### M. Arlington Trust Company

The applicant employed six attorneys and four paralegals who expended a total of 331.5 hours in this category. The applicant seeks compensation in the amount of $38,454.50 for work in this category that included the trial of an adversary proceeding filed against the Arlington Trust Company. Two hundred and fifty three and 25/100 hours were spent by attorneys charging from $95 to $195 per hour. Only 7.7 hours of this total were billed at the $95 rate. The remaining 245.55 hours were billed at rates between $120 and $195 per hour. Additionally, 36.25 hours of attorney time were billed at rates between $65 and $75 per hour, along with 42 hours of paralegal time billed between $40 to $60 per hour, with only nine of those hours being billed at the $40 level.

### N. The Conveyco Plaintiffs

The applicant employed five attorneys in this category that primarily involved the drafting of an answer to a complaint, a motion for summary judgment and court appearances. The attorneys spent a total of 100.75 hours on this matter that was resolved on the motion for summary judgment in the Debtor's favor. The applicant seeks compensation in the amount of $12,390 for its services. A review of the fee petition reveals that 87.3% (88 hours) of the total time was spent by attorneys charging from $95 to $195 per hour and of this percentage only 5.6% (5 hours) of the time was charged at $95 per hour with the balance charged at between $120 to $195 per hour. Only 12.5 hours were spent by an attorney charging $75 per hour.

### O. Bright Ideas/Northeastern Software, Inc.

The applicant employed two attorneys and two paralegals in the successful resolution of this matter that involved establishing terms for the collection of over $.5 million in accounts owed to the Debtor by three Connecticut corporations. The two attorneys spent a total of 41.8 hours for which the applicant seeks compensation in the amount of $5,357.50. The two attorneys billed for 33.55 hours at rates ranging from $145 to $150 per hour. The two para-

legals spent 8.25 hours at rates ranging from $50 to $65 per hour.

### P. Software Control

The applicant employed three attorneys and one paralegal in this category that involved negotiations and business arrangements with Software Control, Inc., a minority controlled business in Washington, D.C. that provides computer software and training to employees of businesses and the federal government. The attorneys involved spent a total of 60.5 hours for which CH & S seeks compensation in the amount of $8,463.75. The applicant requests approval of rates ranging from $145 to $195 per hour for 53.5 hours of attorney time, and rates ranging from $50 to $55 per hour for seven hours of paralegal time. The Court is unaware of how the Debtor's arrangements with Software Control benefitted the estate.

### Q. Northeast Metal

The applicant claims to have employed five attorneys [1] in this category that involved legal action with respect to the exercise of self-help by Northeast Metal and the removal and eventual return of air-conditioning units used to keep the Debtor's main frame computer functioning. The attorneys and paralegals expended a total of 21.5 hours for which the applicant seeks compensation in the amount of $2,422.50. Sixteen hours were billed by attorneys with rates between $95 to $165 per hour and two attorneys spent 5.5 hours at rates ranging from $40 to $65 per hour.

### R. Fee Application

The applicant employed six attorneys and two paralegals in the preparation of its fee application. These individuals spent a total of 144.7 hours preparing the various fee applications, and CH & S seeks compensation in the amount of $9,520.50 for their efforts. Forty-two and 7/10 hours were spent by attorneys charging from $95 to $195 per hour. Only 3.5 hours were billed at the $95 per hour rate. The remaining 39.2 hours were billed at rates ranging from $120 to $195 per hour and two hours

were billed at $75 per hour. CH & S also billed for 100 paralegal hours at rates ranging from $50 to $65 per hour.

### III

The Court conducted a hearing on fee applications on June 18, 1987. At that time the Court requested CH & S and Hale and Dorr to provide it with compilations, in columnar form, of the number of hours spent by each attorney and paralegal, the rate charged for their time and the total amount billed per individual, the final addition of which would provide the total amount of the fee requested. Where the figures on the compilation sheet provided by CH & S differ from the figures found in the three formal fee applications, the Court has used the material found in the actual fee applications as the basis of its findings.

The first application of CH & S for fees and disbursements, which was filed with the Court on January 9, 1987, was for the period April 19, 1986 through January 9, 1987. Through this initial application, CH & S seeks $252,111 in fees and $14,145.39 in disbursements. The second application that was filed on February 17, 1987 was for the period January 10, 1987 through February 12, 1987. The applicant seeks an additional fee in the amount of $44,402.50 and compensation for disbursements in the amount of $6,411.99 in that application. The third and last application covers the period from February 13, 1987 through March 16, 1987 and includes some services rendered and expenses incurred during the time periods covered by the January and February applications, but which were omitted from them. The applicant seeks an additional fee in the final application in the amount of $66,791.25 and compensation for disbursements in the amount of $6,101.17. In total, the applicant seeks approval of $363,304.17 for fees and $26,658.55 for disbursements. CH & S obtained a retainer of $26,757.17 that must be applied against the fee requested, leaving a balance of $336,547, plus $26,658.55 for disbursements

---

**1.** The Court notes that one of the persons listed as an attorney is actually a $40 per hour paralegal mistakenly listed in the attorney group.

for a total of $363,205.55. However, the January, February and June applications actually total $363,304.75 not $363,304.17. Also, if one adds $363,304.17 plus disbursements of $26,658.55 the correct total is $389,962.72 not the total stated in the application of $389,963.30. To avoid confusion, the Court will adopt the corrected figure of $363,304.75 as the total amount of requested fees.

The first fee application contains no less than nineteen mathematical errors. The total number of hours for services is shown as 2,252.3 hours. However, when the total number of hours column on Exhibit B that is attached to the January 9, 1987 application is added, that total is 2,188.66 hours. Unfortunately, neither of these figures is correct. When the hours worked by each of the individuals as shown on pages eight through thirty-nine of the application are added the correct total that should have appeared on Exhibit B is 2,231.55.

The "value" column on Exhibit B to the January 9th application also shows a total of $252,111. This is the total fee request for the period covered. The correct total for this "value" column is $254,373.50. Regrettably, neither of these "total due" figures are correct if the nineteen mathematical errors are corrected. The "total due" figure should be $261,044.75.

The first supplemental fee application filed on February 19, 1987 contains far fewer mistakes, both in number and nature. In paragraph 4 of the application, the applicant seeks compensation for 427.-65 hours, although the correct total of the hours actually listed on pages four through eighteen is 426.9 hours. Another example of the mathematical mistakes that riddle the applications is that the number of hours sought for "General Administration" is listed as 121.35 hours. However, the correct number should be 122.35 hours. The first supplemental application and the final fee application, are both affected by these mistakes since they incorporate the first application.

As an aid to the Court in determining the work actually performed, supporting documentation must be attached to the fee ap-

plications from which the Court can determine the nature of the work performed, by whom it was performed, the time spent, the results achieved and any other factors for which the attorney wishes to obtain credit. It is unacceptable and unfair to the Debtor, counsel, creditors and anyone affected by the proceedings for the Court to have to guess what work was actually performed.

The Court notes that the computer can be used either to enlighten or to obfuscate its analysis of fee applications. The Court determined that it was pointless to carefully review each and every finely printed entry on the 147 pages of computer printouts supplied to it in this case. The Court simply could have disregarded these attachments as totally useless, but it chose not to do so. The Court reviewed the entries to the extent that its patience would allow, considering that approximately 5,600 lines of computer printout were attached to the application that tell the Court such things as:

"Telephone Business." For this entry the estate was charged $41.25.

"Telephone correspondence, telephone & correspondence, Local counsel re: Bankruptcy." For this entry the estate was charged $72.50.

OCNF. Call re: retention of Bullerio" For this entry the estate was charged $146.25.

"Conference Fletcher Hill Re PC Network, etc" For this entry the estate was charged $195.00

"Telephone" For this entry the estate was charged $36.25.

"Calls to Judy Loeb re invoices calculate prelsference (sic):" For this entry the estate was charged $442.00.

"Revise Supp.Disc. and confirmation order; AQ Arlington Supp. objection; MT Polebaum AN Ferrari Re Conf Hearing; MT Normandin Re conf. Order; TE friffes Re Conf. issues; TE Levinson and Faulk re Liquidation analysis and projections; MT LPF–H and Page re research; TE Sweet' letter to T Moyle." For this entry the estate was charged $1,015.00.

This Court could consume 147 pages of its own with similar or worse examples of

cryptography. The Court, however, must deal with what is has before it.

In reviewing the printouts the Court finds that the applicant sent more than one attorney to attend court hearings and other conferences. It is almost impossible to identify the number of hours of duplicative effort which could be disallowed as a consequence, particularly since the necessity of having two attorneys attend hearings was not explained.

The Court was able to glean from the previously described printout sheets that Attorney Fine spent in round figures about 45 to 50 hours on the telephone at $165 per hour. The Court stopped adding the time less than two-thirds of the way through the printouts and estimated about 70 more hours on the telephone at $195 per hour for Attorney Fine. Attorney Glerum, whose time was billed at between $125 and $145 per hour with the overwhelming majority being billed at $145 and who had the most billable hours (about 575) was equally loquacious on the telephone. The Court simply could not tally the numbers since it became both mind boggling and eye straining. The applicant failed to identify the subject matter or importance of the phone calls, whether the calls involved these two attorneys or others.

Between April 22, 1986 and December 17, 1986 the Court was able to identify approximately fifty hours of in-house conference time between Attorney Fine, Attorney Glerum and on occasion other attorneys. Although it is impossible to identify exactly how many of these hours were billed simultaneously by each of these attorneys, the Court was able to identify a substantial number of these in-house conferences being billed at full hourly rates by each of the attorneys in session. Clearly, the applicant is attempting to obtain compensation for an excessive amount of interoffice conference time at full rates for all participants. While the issues raised in this proceeding were not formidable in size and scope, there were complex and difficult issues involved that may well have warranted an exchange of ideas and information among counsel. However, the Court

lacked sufficient information to enable it to determine when billing for duplicative hours was justified.

With respect to other activities, CH & S's applications are equally unacceptable. For example, the applications reveal, without explanation, that Attorney Fine took one half hour to draft a notice of stay, took two and one-half hours to file and obtain an order of notice, took three hours to draft and file a motion, took one hour to write a letter, took two hours to draft a complaint and motion, took three and one half hours to review documents, took one hour to draft a motion to assume, took another five hours to draft motions "re Methuen Lease," took one half hour to file a motion, took one hour to draft a letter "re Settlement," took forty five minutes to review a complaint, took one hour to review a revised order, took two and one half hours to review a revised order, took two and one half hours to review a pleading, took one hour to draft a letter and another half hour to draft another letter, took one and one half hours to review a "project," and took four and one half hours for "misc.," just to mention a few entries at $165 per hour. More detail is unnecessary, but it is noteworthy that Attorney Fine also charged $195 per hour for "reviewing files" for three and one half hours and for doing more "misc." for two hours.

Entries for other attorneys include four hours to "read complaint turnover accts receivables," one hour at $190 per hour to "tel. a/client draft cs," four hours at $95 per hour re: "Meeting w/Hajjar: organizing and viewing docs," and one and one half hours at $190 per hour for an unidentified activity. Having spent more time on the printouts than they are reasonably worth, the Court turned to the previously summarized portions of the three fee applications and its own recollection of activities brought before it to compute the lodestar.

This case had its harrowing moments, particularly when the plan funder threatened to withdraw from the proceeding. But, except for a few peculiar problems, stemming from an emphasis on growth at the expense of consolidation, and poor

management, the case was not extraordinary at its inception. There were no intractable legal problems presented and the problems and legal issues that did crop up were well within the sphere of competence of the applicant or any other medium to large bankruptcy firm in Boston. Certainly the size of the case and its many facets did require a level of skill greater than that necessary to formulate a plan for an uncomplicated small business reorganization, and the attorneys involved, particularly Attorneys Fine and Glerum, did a very commendable job keeping the case on track for confirmation.

■ However, in view of the poor quality of the computer entries and the inability of the Court to assess the value of the services performed by the applicant as a result, the Court, in an effort to be fair to the applicant as well as to the creditors in the case, has chosen to accept the total number of hours as calculated by the applicant. Instead of subtracting excessive, duplicative or unjustified hours from the total hours expended, the Court chose to account for them by adjusting the hourly rates charged by the attorneys and paralegals downward.

■ The paralegals primarily rendered services such as checking the docket, ordering and obtaining documents from courts, updating the files, checking court dates, and delivering papers. The Court was able to identify some paralegal entries where paralegals actually drafted some pleadings or performed other types of work less mundane than the list just cited. This, however, in no way justifies paralegal hourly rates of up to $70 per hour. The applicant seeks compensation for about 222 hours of paralegal time at the $65 or $70 level; about 223 hours at the $50 to $60 level and about 260 hours at the $40 to $45 level. The Court finds that a rate of $30 per hour is appropriate and reasonable considering the real need for over seven hundred hours of paralegal time and the ministerial nature of the services rendered.

■ Bankruptcy needs and indeed invites competent counsel. They must be prepared however to live within the lodestar concept for establishing reasonable fees for all of the work they do, from the simple and mundane task of answering nuisance telephone calls to trying the most complex issues before the Court. The hourly rate charged by an attorney is not a measure of his competency. The assumption that the passage of time alone warrants an automatic increase in counsel's hourly rate is unacceptable in a bankruptcy context. The notion that on June 30th an attorney is reasonably worth a particular hourly rate, and the next day, on July 1, the attorney's hourly value increases by 19% is without justification. Since the Court is concerned with establishing a reasonable fee taking into consideration all of the elements generally used in arriving at a lodestar hourly rate, the Court must ask what conceivable justification is there for what appears to be arbitrary hourly rate increases on an overnight basis from $95 to $120; from $110 to $125; from $125 to $145; from $135 to $150; from $140 to $155; from $165 to $175; from $165 to $195?

The Court must also raise the question: "When do hourly legal rates become oppressive?" Although our only concern here is to find and use an appropriate yard stick to measure reasonable fees, the Court simply cannot refuse the opportunity to note its concern for the chilling effect the uncontrollable surge in hourly rates is having upon this and most other courts given the number of fee opinions being published. Is it ever reasonable for an estate to be charged $3.25 for every minute worked by an attorney?

Bearing in mind the actual services rendered, the manner in which they were rendered, the necessity for the number of hours rendered, whether or not the service rendered could have been rendered as well by a more junior member of the firm, the Court makes the following allowances:

| Name | Allowed Hours | Allowed Hourly Rate | Total Allowance |
|---|---|---|---|
| Gargill | 2.15 | $150 | $ 322.50 |
| Hines | 8.50 | 150 | 1,275.00 |
| Fine | 472.75 | 150 | 70,912.50 |
| Burns | 10.50 | 150 | 1,575.00 |
| Laurence | 1.50 | 100 | 150.00 |
| Grumbacher | 41.50 | 150 | 6,225.00 |
| Rothberg | 70.30 | 140 | 9,842.00 |

| Name | Allowed Hours | Allowed Hourly Rate | Total Allowance |
|---|---|---|---|
| Nadas | .50 | $100 | $ 50.00 |
| Light | 2.25 | 100 | 225.00 |
| Faulk | 31.05 | 130 | 4,036.50 |
| Leach | 112.75 | 110 | 12,402.50 |
| Glerum | 503.75 | 110 | 55,412.50 |
| | 170.25 | 100 | 17,025.00 |
| Walsh | .75 | 90 | 67.50 |
| Spiro | 238.55 | 100 | 23,855.00 |
| | 60.50 | 85 | 5,142.50 |
| Shirley | .25 | 80 | 20.00 |
| Griesinger | 236.90 | 95 | 22,505.50 |
| Fletcher–Hill | 278.20 | 75 | 20,865.00 |
| Subar | 59.20 | 65 | 3,848.00 |
| Cope | .25 | 50 | 12.50 |
| Page | 174.00 | 60 | 10,440.00 |
| Gurge | 2.50 | 60 | 150.00 |
| Faust | 19.25 | 50 | 962.50 |
| Paralegals | 704.71 | 30 | 21,141.30 |
| | 3202.81 | | 288,463.30 |

On June 29, 1987 the Court ordered total fees to be paid to the applicants in the amount of $274,416.42 before deducting the amount of the retainer. On July 6, 1987, the applicant requested the Court to make its findings of fact and conclusions of law. In reviewing all of the material the Court used in arriving at its original allowance of $274,416.42, the Court found that it inadvertently omitted from its final calculations over 100 hours of a senior attorney's total hours thus proving that even the Court is not above making arithmetical mistakes. The Court's calculations have been adjusted accordingly.

The Court finds that the hourly rate associated with each attorney is a reasonable hourly rate over the course of the proceedings. Neither an upward nor a downward adjustment of these rates is warranted. There has been no unreasonable delay in setting the fees, nor any doubt that any fee allowed would not be paid within a reasonable time.

■ The general principle governing reimbursement of expenses is that the charges must have been necessary. Charges which are part of the cost of operating overhead are not properly chargeable to the estate. The reasonable hourly rate allowed to counsel takes into consideration the ordinary and usual costs of doing business. Thus, reimburseable expenses, in the Court's opinion, do not include the ordinary costs of operating an office and servicing the client in the light of the hourly rates charged, such as overtime to employees, rent, and messenger charges, except in emergency situations, postage, copying, unless it is extraordinary, local travel, and meals, except when on extended travel. Using the above measures the Court has made the following allowances and disallowances:

| Messenger | $2,573.83 | Allowed 2 |
|---|---|---|
| Special copy | 82.55 | Allowed |
| Filing & fees | 2,165.14 | Allowed |
| Meals & local travel | 744.78 | Disallowed |
| Overtime | 1,853.16 | Disallowed |
| Postage | 1,671.35 | Allowed 3 |
| Telecopier | 988.86 | Disallowed |
| Telephone | 2,853.33 | Allowed 4 |
| Special fees | 380.83 | Allowed 5 |
| Xerox | 5,244.85 | Allowed 6 |
| Velobind | 53.70 | Allowed |
| Court Reporter | 767.30 | Allowed |
| Other search fees | 938.90 | Allowed 7 |
| Service fees | 322.30 | Allowed |
| Misc. | 327.75 | Allowed 8 |
| West Law | 259.81 | Disallowed |
| Lexis | 185.26 | Disallowed |
| | 17,381.83 | Allowed |
| | 9,276.72 | Disallowed |
| | 26,658.55 | |

## IV

The law firm of Hale and Dorr, counsel to the Creditors' Committee, filed three fee applications plus an amendment to its fee applications. The firm seeks $168,275 for services, plus a $15,708.13 reimbursement

**2.** Allowed, although normally it would have been disallowed except where shown to be necessary.

**3.** Allowed on the assumption that this is for extraordinary mailings.

**4.** Allowed on the assumption that these are all documented toll calls.

**5.** Allowed even though there is no identification as to what they are.

**6.** On an equitable basis only, the Court has allowed 50% of this item even though there is no indication as to what was ordinary or extraordinary copying, nor whether it was done in house, or outside, nor the charge per copy.

**7.** Allowed, even though there is no explanation as to what they are, nor whether it was in-house or otherwise.

**8.** Allowed, although normally an unexplained item would be disallowed.

for expenses. It also requests a premium in the amount of $22,000.00.

Hale and Dorr filed their first fee request on January 9, 1987, seeking compensation in the amount of $110,896, rounded to $110,000, plus a 20% premium of $22,000, plus $12,610.45 for disbursements.

The firm filed a supplemental fee application on February 18, 1987, seeking compensation in the amount of $10,847.50 plus $1,402.04 for disbursements. Thereafter, on June 2, 1987 they filed a final fee application seeking additional compensation in the amount of $31,112.25 and $2,681.41 for disbursements. At that point, their final cumulative request was $173,000 for compensation and $16,693.90 for disbursements. By their amendment, filed on June 8, 1987, they reduced their final request to $168,275 for compensation and $15,708.13 for disbursements.

An indepth review of the three fee applications reveals only minor errors in the compilation of the total hours extended by attorneys and paralegals. Two attorneys included in their final tally of hours a total of 9.5 hours which were not recorded in their time sheets. The average hourly rate for these two attorneys is $185 per hour resulting in an over billing of $1,757.50. This in and of itself is not a grave error, but it does account for nearly 9% of the Court's disallowance.

■■■ Attorney Fisher, a highly respected bankruptcy practitioner and a senior member of the firm, billed a total of 57.2 hours, charging a straight $225 per hour. In charging this rate, Hale and Dorr gave no consideration to the task involved or to the resulting double and triple billing involved since a large portion of Attorney Fisher's total time was spent either in conference with, or in the company of, other members of the firm, each of whom billed at full rates for the time spent together. For example, when Messrs. Fisher, Swaim and Polebaum conferred, each charged their full hourly rate for a total firm hourly rate of $595 per hour. These duplicate billings occurred throughout the firm's representation of the Creditors' Committee. At least ten hours or about 18% of Attor-

ney Fisher's time was spent with associates, whether in the office, at meetings, or on the telephone. Attorney Fisher spent in excess of three hours on the telephone speaking with creditors or others, without any explanation of the reasons for, or the contents of, the calls, their importance, or what they accomplished. The rate to be used in his lodestar formula has been adjusted downward accordingly.

Attorney Swaim spent a total of 270.2 hours during the entire period of representation. He billed in excess of 30 hours for in-house conferences, or joint appearances with associates. Attorney Swaim billed a full $210 per hour at the same time his associates, for the most part, were also billing. Most of these double and triple billings were for inter-office conferences or telephone calls. Attorney Swaim spent approximately 75 hours on the telephone with a variety of individuals. Some of the entries on the fee applications contain a description of these calls, indicating their importance or lack of importance, but at other times there is no meaningful description of the calls at all. Most of the descriptive language simply leaves the Court wondering.

Attorney Swaim spent between 20 and 25 hours attending meetings outside the office with one or more of his associates. He invariably billed the estate his full hourly rate for each attendance. He also billed the estate $798 for a trip to Methuen, Massachusetts. In addition to these activities, Attorney Swaim spent four to five hours reading cases and doing Lexis research, spent a number of hours reading and revising minutes of Creditors' Committee meetings that were generally prepared by an associate or a paralegal, and spent time preparing in-house memos. The Court would be remiss if it did not mention the six minutes at $210 per hour Attorney Swaim took to read a motion to extend the 120 day exclusivity period, as well as the six minutes he took to read the opposition. This alone cost the estate $41, plus the time it took his associate to prepare the motion and to review it before sending it to Attorney Swaim for his perusal.

Attorney Swaim can be viewed as the lead senior counsel and general supervising counsel for the Creditors' Committee. He did a fine job. But one must look to the actual work performed by each attorney in order to value their work and their contribution to the end result. Attorney Swaim rendered some very valuable services in many areas. I have attempted to identify a lodestar rate which reflects the mix of important and routine services he rendered.

 Attorney Polebaum spent a total of 319.5 hours during the entire representation, and he charged $160 per hour for each hour expended. Here again, as with Attorney Fisher and Attorney Swaim, Mr. Polebaum charged for at least 20 to 25 hours of time spent in the company of his associates. He charged for a substantial number of hours spent attending conferences and meetings away from the office in the company of associates, causing double and/or triple billing for that period of time. He spent in excess of 40 hours on the telephone with little or no explanation of the purposes of or results of the calls; he spent three to four hours reading letters, and some nine to ten hours writing letters. Together with Attorney Swaim, Attorney Polebaum spent 3/10 of an hour, at a total cost of $111, to arrange for an appraisal. He also spent 2.1 hours to "Draft professional findings and conclusion of law." Both he and Attorney Swaim charged for drafting and reviewing Creditors' Committee meeting minutes, and he and others charged for reviewing a press release. These are the types of excesses, which when taken together, prompt the Court's indepth and detailed review of all entries which, in this instance are legible but frequently incomprehensible. Although the Court has criticized some of Attorney Polebaum's entries, for lodestar purposes the Court has allowed him the requested $160 per hour since, in the Court's opinion, most of his hours were spent in a substantially meaningful way. The Court's adjustments to the lodestar rate for his seven associates sufficiently reflect the double and triple billings, as well as the net value of the work done and resulting accomplishments.

Attorney Miller spent a total of 31.8 hours during Hale and Dorr's representation of the Creditors' Committee, billing at the rate of $105 per hour for the entire period. Of her total time, she spent approximately three hours in meetings with her associates, one hour at a Creditors' Committee meeting with Attorneys Fisher and Swaim, and two to three hours on the telephone with little or no explanation as to the content of the calls. Additionally, the firm billed for time she spent making copies of a "preference list" for Attorney Polebaum, and the nine hours she spent "study[ing] in preference law."

Attorney Fox, whose time was billed at $72.50 per hour, spent a total of 490 hours for the entire period. He spent approximately five to six hours in conference with his associates, and approximately ten hours on the telephone with little or no explanation of the content of the calls. He took one and 1/10 hours to write five letters and spent in excess of six hours writing letters generally. Additionally, he accompanied his associates to Creditors' Committee meetings. He spent eight hours drafting a complaint, four hours drafting a stipulation and one hour revising a stipulation.

Mr. Mack, an attorney charging $175 per hour, billed the estate for a single conversation with Attorney Polebaum re: "unrecorded assignment of Lease" that lasted 1/10 of an hour. Attorney Sigel whose billing rate is $140 per hour spent a total of 4/10 hours to "review lender letter." Unidentified students, whose time was charged out at $35 per hour, spent a total of 36 hours on the "study of law" of old Chapter X cases relating to the ouster of management.

 Attorney Vaughn spent 1.4 hours in total during Hale and Dorr's representation of the Committee, charging $275 per hour. The following are his entries:
".2 telephone to Polebaum";
".2 telephone from Polebaum";
".1 telephone to Case";
".3 telephone to Gill".
".2 Conference with Polebaum";
".3 Conference with Polebaum";
".1 telephone to Polebaum"

For these entries, the firm seeks compensation in the amount of $385. The Court could disallow this amount in its entirety. However, because the overall results in this case have been commendable, the Court will allow what might appear as a shockingly high lodestar rate of $175 per hour (a reduction of $100 per hour) for Attorney Vaughn.

Ms. Hock, a paralegal with the firm, spent a total of 334.8 hours. Her hourly rate is $55 per hour. In excess of seven hours of her time was spent in in-house conferences with senior attorneys or associates, all of whom were billing for their time. Ms. Hock spent in excess of ten hours going to Court to obtain copies of documents; she spent three and ²/₁₀ hours in a taxi going from Boston to Lawrence to Waltham and back to Boston; she spent in excess of 15 hours attending Creditors' Committee meetings or on committee conference calls along with her associates; she spent in excess of 30 hours on the telephone on matters not explained or inadequately explained; she spent in excess of four hours writing memos to her associates; she spent in excess of 11 hours reading or writing letters; and she spent 35.2 hours either writing, revising or reviewing minutes of meetings.

Normally, this Court will not allow more than $30 per hour for paralegal time, except in extremely special circumstances. If paralegals, rather than junior associates, in fact prepare pleadings, do the research, prepare memos, interview witnesses or others, then the cost of their services should be commensurate with those tasks. However, the hourly rate to be paid for paralegals who run errands, obtain copies, file papers, sort the files, answer the telephone, carry brief cases to Court and back, and direct mail should not exceed $30 per hour. In view of the attempt made by counsel to have Ms. Hock take on as much responsibility as possible and in spite of the number of hours spent doing the above mentioned relatively ministerial work, the Court has chosen not to reduce the requested hourly rate.

The Court would not normally expect to see charges for research time expended by a librarian, let alone a $75 per hour rate for that time, since such research would normally be part of the firm's overhead. However, because of the nature of the research undertaken in this instance, the Court will allow a $50 per hour charge.

As in the application of Choate, Hall & Stewart, the Court has chosen to accept the total number of hours requested by each of the attorneys and has set a reasonable hourly rate representing the mix of services rendered, rather than attempting to discount or eliminate certain hours for justifiable reasons. In the case of Hale and Dorr, the Court has not discounted the mistake in the total number of hours charged by two attorneys since the number of hours is de minimis.

Accordingly, Court makes the following allowances:

| Name | Allowed Hourly Rate | Allowed Hours | Total Allowance |
|---|---|---|---|
| Mr. Fisher | $175.00 | 57.2 | $ 10,010.00 |
| Mr. Vaughn | 175.00 | 1.4 | 245.00 |
| Mr. Swaim | 150.00 | 270.2 | 40,580.00 |
| Mr. Mack | 100.00 | .1 | 10.00 |
| Mr. Polebaum | 160.00 | 319.5 | 51,120.00 |
| Mr. Sigel | 100.00 | .4 | 40.00 |
| Ms. Miller | 100.00 | 31.8 | 3,180.00 |
| Mr. Fox | 70.00 | 49.0 | 3,430.00 |
| Ms. Crowley (Librarian) | 50.00 | .8 | 40.00 |
| Ms. Hoch | 50.00 | 334.8 | 18,414.00 |
| Students | 30.00 | 36.0 | 1,080.00 |
| | | | 128,099.00 |

The Court further allows a $10,000 premium. In light of the results obtained for the unsecured creditors and in light of what other counsel have requested and have been allowed, it is apparent to the Court that the Counsel to the Creditors' Committee deserves an upward adjustment of $10,000, for a total fee allowance of $138,099.

With respect to disbursements, the Court used the same criteria recited earlier to make the following allowances and disallowances:

| | | |
|---|---|---|
| Photocopy | $2,902.50 | Allowed 9 |
| Telephone | 2,869.60 | Allowed 10 |
| Travel | 1,575.07 | Allowed 11 |
| Meals | 1,349.72 | Allowed 12 |
| Messengers | 1,218.75 | Disallowed |
| Secretarial Overtime | 884.80 | Disallowed |
| Postage | 638.74 | Allowed |
| Word Processing Charges | 155.00 | Disallowed |
| Lexis | 550.00 | Disallowed |
| Courier Services | 192.50 | Disallowed |
| Outside Services/subpoena | 319.00 | Allowed |
| Filing Fees | 130.00 | Allowed |
| Supplies | 69.00 | Allowed 13 |
| Misc. | 1.00 | Allowed 14 |
| | 9,854.63 | Allowed |
| | 5,853.50 | Disallowed |
| | 15,708.13 | |

In *In re WHET, Inc.,* 58 B.R. 278 (Bankr.D.Mass.1986), the court issued the following notice:

> [H]enceforth, in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance.

*Id.* at 281. This Court hereby adopts that notice. Computer printouts of the type and quality submitted by CH & S in this proceeding will no longer be accepted by the Court.

In view of the foregoing, the Court hereby confirms a corrected award to CH & S in the amount of $288,463.30 for fees and $26,658.55 for expenses and its award to Hale and Dorr in the amount of $138,099 for fees and $9,854.63 for expenses.

9. See footnote # 6

10. See footnote # 4

11. Allowed even though there is no identification as to what they are.

12. Allowed on the assumption they were incurred in travel away from Boston.

13. Allowed even though supplies of a general nature are part of overhead expense

14. See footnote # 8.