In re NEW ENGLAND
CATERERS, INC., Debtor.

Bankruptcy No. 87–11928–HAL.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 6, 1989.

Frederick D. Grant, Jr., Gordon & Wise, Boston, Mass., for Creditors' Committee.

Jeffrey Sternklar, Burns & Levinson, Boston, Mass., for Metlife Capitol Credit Corp.

Mark G. DeGiacomo, Roche, Carens & DeGiacomo, Boston, Mass., for Nat. Bank of Greece.

Irving Widett, Widett, Glazier & McCarthy, Boston, Mass.

Thomas Bean, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for Circle Business Credit Corp.

Daniel C. Cohn, Fine & Ambrogne, Boston, Mass., for Landlord Olympia and York.

Milton Glanz, Waltham, Mass., for James Brudnick.

G. Emil Ward, Allston, Mass., for Y.W.C.A.

James W. Campbell, Gillis & Campbell, Hingham, Mass., for Gene Fortun Associates.

Jonathan D. Friedmann, Gargill, Sassoon & Rudolph, Boston, Mass., for George Varoudakis and successor corporate counsel.

## FINDINGS AND RULINGS ON DEBTOR'S FUNDS USED BY COUNSEL

HAROLD LAVIEN, Bankruptcy Judge.

This is a companion opinion to the "Findings and Rulings" in State Street Stock Exchange, Ltd. However, here, we will examine the financial transactions between debtor, New England Caterers, Inc. ("NEC") and counsel, Widett, Glazier & McCarthy ("WGM"), and also consider the propriety of counsel's final fee application. To the extent that the facts are repetitive of those in the earlier opinion, they will not be repeated except as they may be essential to understanding these findings and rulings.

### Chronology of Chapter 11 Events

New England Caterers filed for Chapter 11 protection on December 10, 1987. (87–11928–HAL) The next day, a motion was filed to employ Irving Widett as counsel to the debtor-in-possession. An order was entered on December 17 allowing Widett's employment as of December 11, 1987. On January 12, 1988, WGM and NEC filed the "Statement of Affairs of Debtor Engaged in Business." There are egregious errors and omissions in this document. On June 3, 1988, Irving Widett and the law firm of Widett, Glazier & McCarthy moved to withdraw from the case and appoint successor counsel; the Court allowed the motion on June 6, 1988 and approved the appointment of Sumner Darman, Esquire as successor counsel.

At the time of WGM's withdrawal, the State Street case had been dismissed, the problems with the Bank of Greece and the NEC's liability on the State Street lease were unresolved and crucial to the ultimate viability of NEC. New counsel was able to negotiate solutions involving new financing and readjustment of the leased premises and to obtain confirmation of both the NEC case and a newly filed State Street case.

On May 22, 1989, WGM filed its first Application for Fees. This was subsequently amended on July 24, 1989. A hearing on fee applications for NEC was held on July 26, 1989. Counsel for George Varoudakis presented the Court with a letter objecting to payments made to WGM. It was at this time that the Court first became aware that there were any irregularities in the transactions between the debtor, its counsel, and the Court. Action on WGM's fee application was deferred and the Court then ordered WGM to file an accounting for all funds received and their allocation. On July 28, 1989, counsel filed an accounting in letter form with an affida-

vit attached, accounting for all fees received and their allocation. From the July 28, 1989 submission and the supplementary filing, dated August 8, 1989, also in letter form, it was clear that the Statutory and Bankruptcy Rule provisions dealing with fees had not been complied with. An aborted hearing was held on August 30, 1989, at which time counsel for WGM was advised of various discrepancies and told that a hearing would be scheduled. On September 5th, an Order to Show Cause issued. (*See* opinion in State Street Stock Exchange.)

One day prior to the Show Cause hearing, WGM filed a Motion to Continue. The Court denied this motion. It was simply filed too late. At the hearing on September 26, 1989, counsel for WGM was heard in favor of its fee application and Sumner Darman, counsel for the debtor, the United States Trustee, and personal counsel for Varoudakis were each heard in opposition. Counsel for WGM conceded the statutory and rule violations and explained that the client was difficult, and that they had accomplished significant tasks for the estate. However, no pleadings were filed to correct the deficiencies in the earlier filings. The United States Trustee requested additional time to comment on WGM's fee application as they had, thus far, concentrated their attention on State Street. The trustee was given additional time for written comments and WGM was given time to respond. The U.S. Trustee has submitted its written comments and WGM has submitted its response.

### Statutory Provisions and Bankruptcy Rules

■ It is the legal responsibility of debtors' counsel to report pre- and post-petition fees. Bankruptcy Rule 2017(a) requires that an attorney file a statement in compliance with 11 U.S.C. § 329 within 15 days. In that statement, the attorney must disclose any money he has received, or will receive, in connection with a bankruptcy. If the attorney receives a payment not previously disclosed, he is obligated to file a new statement in compliance with the Rule 2017(b).

Widett, Glazier & McCarthy did not file the required attorney statement. In fact, the "Statement of Affairs" they prepared did not admit to having received and retained fees from the debtor.

### Chronology of Debtor's Financial Relationship with Counsel

■ New England Caterers engaged WGM for legal services in 1986 and, on August 15th of that year, WGM requested a flat $5,000 retainer for the litigation with the Bank of Greece. On January 21, 1987, within one year of the bankruptcy filing, WGM requested a *monthly* retainer of $5,000 to serve as "personal and corporate counsel" on a variety of matters, specifically including NEC. Neither of WGM's explanatory letters of July 28, 1989 and August 8, 1989 account for any other monies received by them for use in the NEC bankruptcy, although in the accompanying accounting affidavit, they reveal that $3,552.26 was applied to NEC matters. In fact, the following checks were issued by New England Caterers on its Bay-Bank/Middlesex account to its attorneys, Widett, Glazier & McCarthy during 1987:

| Date | Number | Amount |
|------|--------|--------|
| 6/18/87 | 15667 | $ 3,000 |
| 8/12/87 | 16155 | 9,500 |
| 9/1/87 | 16306 | 3,500 |
| 10/16/87 | 16706 | 3,700 |
| TOTAL | | $19,700 |

In addition, counsel admit to receiving $15,000 from the Varoudakis Family Trust but deny applying this amount to either case. Cash payments also appear to have been involved in the dealings between counsel and Varoudakis and the entities in which he was interested.

In the "Statement of Affairs", the answers prepared by counsel for the debtor to questions 20(a), (b) and (c), give no clue that there were any financial transactions between the debtor and counsel, and actually deny their existence.

The questions and answers 20(a), (b) & (c) of the Statement of Affairs are as follows:

20. PAYMENTS OR TRANSFERS TO ATTORNEYS

(a) Have you consulted an attorney during the year immediately preceding or since the filing of the original petition herein?

George F. Christodoulo 12/10/86
Posternak et al.
100 Charles River Plaza
Boston, MA 02114

Gargill, Sassoon & Rudolph 1/1/87
92 State Street
Boston, MA 02109

Widett, Glazier & McCarthy 3/1/87
90 Canal Street
Boston, MA 02114

(b) Have you during the year immediately preceding or since the filing of the original petition herein paid any money or transferred any property to the attorney, to any other person on the attorney's behalf, or to any other person rendering services to you in connection with this case?

None

(c) Have you, either during the year immediately preceding or since the filing of the original petition herein, agreed to pay any money or transfer any property to an attorney at law, to any other person on the attorney's behalf, or to any other person rendering services to you in connection with this case?

Widett, Glazier & Amount: $0.00
McCarthy

Circumstances: Agreement to pay any future compensation as should be allowed by the Bankruptcy Court.

It is absurd for WSG to contend in answer to 20(a) that they did no work for NEC until March 1, 1987 when, by their own letter of August 15, 1986, they requested a retainer for work on the litigation with the Bank of Greece, an integral part of the NEC case. Further, their letter of January 21, 1987 includes NEC as work in progress that requires a retainer. Their answer to 20(b) is just plain wrong, since there are, at least, the $19,700 in checks from NEC to the attorneys in 1987. Their answer to 20(c) is suspect, since even their July 28, 1989 accounting admits having applied at least $3,552.26 to NEC without notice for approval of the Court.

If, in fact, only $3,552.26 of the $19,700 of NEC funds were used for NEC, the balance of the funds belong to NEC and cannot be used elsewhere. *In re O'Bannon,* 484 F.2d 864 (10th Cir.1973). These checks may also be recoverable preferences, but that matter is not presently before the Court.

It is quite clear that WGM have erred in several ways: they have not filed the required attorney statement of fees received pre-petition; they have not revealed in the "Debtor's Statement of Affairs" that a monthly retainer of $5,000 for undifferentiated services was requested less than one year before filing; they have not listed monies paid by NEC to WGM within one year of filing on the required forms; they applied monies paid to them by NEC to the various other entities.

There is no doubt that the financial interactions of this debtor and this counsel are a tangled web. Cash payments, checks, denials of payment, admissions of payment, are so interwoven that accurate retracing of the transactions is virtually impossible.

 The disclosure rules are the underpinning on which the integrity of the entire bankruptcy system rests. The Court has a need and right to expect from counsel full, unfettered disclosure of all fee and financial arrangements. This fiduciary obligation of counsel must be strictly enforced. *In the Matter of Futuronics Corporation,* 655 F.2d 463 (2d Cir.1981). There are two significant differences in this case from the *State Street* case. Here, counsel did render beneficial services and did file a fee application. Before applying any sanction for counsel's condign treatment of its fiduciary obligation, a review of the application may be appropriate.

*Attorneys' Fees*

The amended application seeks $30,611 as attorneys fees and $1,660.80 as expenses.

Despite having amended its application after the Court advised that it failed to justify its fee request in appropriate form, the amended application still fails to have the necessary descriptive detail and is re-

plete with lumping that makes impossible any accurate evaluation of both the reasonableness of the time spent and the necessity of all services. As just one example, the total description for an item of $7,672 is "(K) Research, preparation of pleadings, attendance at Court Hearings and review of claims." Eight people are listed for approximately 93 hours. What was researched? Who did it? How long? Why was it done? What effect did it have? What hearings or pleadings? Who attended or did the drafting? How long? What claims? Who handled the objection to claims? What result?

█ The matter of reasonableness arises in several contexts: the *reasonableness* of the task in the context of the total scheme of the representation; the *reasonableness* of the time and resources allotted to that task; and, the *reasonableness* of the fee demanded for that task. A person seeking an award of compensation under the Bankruptcy Code has the burden of establishing that the request is reasonable. *In re The Vogue*, 92 B.R. 717, 719 (Bankr.E.D.Mich. 1988); *In re Hamilton Hardware Co.*, 11 B.R. 326 (Bankr.E.D.Mich.1981); *In re Olen*, 15 B.R. 750 (E.D.Mich.1981).

█ Before performing any service, the attorney should first scrupulously weigh and assess the necessity of each task for which he will be seeking compensation. To undertake a thorough analysis, an attorney must consider at least the following questions:

(a) Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?

(b) To what extent will the estate suffer if the services are not rendered?

(c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully? *In re Paul C. Wildman, et al.*, 72 B.R. 700 (Bankr. N.D.Ill.1987).

█ In order for the Court to review fee petitions, some organization of the petition is required, and meaningful information must be collated by subject matter and time value for each project worked on. *Wildman, supra* at 705. The test of the sufficiency of an application for attorneys' fees is whether, standing alone, the application identifies, describes, and explains the services and expenses charged to the estate intelligibly enough to enable the Court to evaluate their reasonableness. An application for fees should be self-contained, including enough material on its face for us to review the charges. *In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 835 (Bankr.D.Vt. 1987); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 582 (Bankr.D.Utah 1985); *In the Matter of Texas Gulf Industries, Inc.*, 4 B.C.D. 186, 191, 16 C.B.C. 129, 239, n. 8 (Bankr.S.D.Texas 1978). At the very least, every fee application must have a specific analysis of each task for which compensation is sought. *In re WHET, Inc.*, 58 B.R. 278, 282 (Bankr.D.Mass.1986).

█ Attorneys are expected to exercise billing judgment. They should, therefore, exclude from their applications, prior to their submission, time spent which, upon reflection, is excessive, redundant, unjustifiable, or otherwise unnecessary. *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 339 (Bankr.W.D.Texas 1989). The burden of proof in all fee matters is on the applicant. *Wildman, supra* at 708; *S.T.N., supra* at 832; *In re Lindberg Products, Inc.*, 50 B.R. 220, 221 (Bankr.N. D.Ill.1985); *In re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr.W.D.Va.1984).

Attention should then be narrowed to the reasonableness of the individual tasks performed. The threshold to each task is a business judgment test as to whether engagement into each activity was necessary in light of the circumstances then in existence. When a Trustee or professional's expectations are not tempered by the solvency of an estate, the result often times is that the case is administered solely for the particular professional's benefit.

Regardless of the ultimate approach utilized by the reviewing Court, a professional would be well advised to style an Application for Compensation in a man-

ner that would facilitate communication with the Court and other creditors seeking to evaluate the request. Logic dictates that such an Application should begin with a narrative discussion of the professional's involvement with the proceeding, including date and conditions of employment. Also, the periods covered and results of earlier fee determinations should be specifically set forth. The various tasks performed, such as "defense of a Motion to Change Venue" should be separately and narratively disclosed. Each description should state the reason behind pursuit of each task; the total compensation/expenses related to the task; the benefit conferred upon the estate. If no benefit was conferred, then further explanation of involvement in the task should be completed. Movants shall be individually identified with description of qualifications such as bankruptcy background and experience. The hourly rate at which such individual is typically billed should be disclosed and be capable of being supported by evidence. *In re Peoples Sav. & Inv., Inc.*, 103 B.R. 264 (Bankr.E.D.Okl.1989).

In addition to the lumping and lack of detail, the United States Trustee, after stressing the difficulty of correlating the time sheets to any of the listed tasks, points to 13.6 hours that are double billed, amounting to $1,350 and $200 of time attributable to a non-debtor. WGM concludes in its response that this $1,550 should be deducted.

■ Another specific deduction previously referred to is the $17,900 received from this debtor from which only $3,552.26 was credited to this debtor. Clearly, the debtor's funds cannot be used for other entities' bills. *In re O'Bannon*, 484 F.2d 864 (10th Cir.1973).

■ The debtor is entitled to credit for the entire $17,900, not just the $3,552.26. Because of the lumping, lack of detail, and inability to correlate time to task, the Court shares the United States Trustee's difficulty in being unable to make an accurate evaluation of the necessity or the reasonableness of time spent or even the necessi-

ty of some of the tasks such as the research. However, in this case, unlike the *State Street* case, there were some definite benefits rendered by counsel to this debtor. The initial filing with its automatic stay and counsel's subsequent activity that held off the Bank of Greece and the landlord, and kept this Chapter 11 alive, although that would have been a fairly short term benefit but for the new tack taken by successor counsel. Counsel did perform all of the necessary tasks in dealing with the U.S. Trustee, creditors, and the courts prior to the change of counsel and was cooperative in that transaction. In light of all of the factors, I will only reduce the fee request ten (10%) percent as my best estimation of at least what would be eliminated if a proper application had been filed that would allow a more accurate evaluation of necessity and reasonableness. The Court does not intend to intimate that in other cases counsel should get the benefit of the doubt. Counsel having created the conundrum, should have all doubts resolved against it. However, in light of this counsel's fee problems, even though a consequence of its own actions, a ten (10%) percent reduction for this aspect will suffice.

■ Finally, there is the sanction appropriate for the inexcusable lack of candor in breach of its fiduciary duty to the Court. It is counsel's misfortune to have had two cases, *State Street* and *New England Caterers*, in tandem so that the lessons taught in one could not be applied in the other. The purpose of this sanction is really to teach that rules of disclosure cannot lightly be ignored. I am sure this firm has felt the impact on its bottom line and needs no further reminders. Also, to totally deny them any fees in this case would simply be salting the raw. To simply waive this breach of so basic a fiduciary responsibility would minimize the absolute essentiality for candor in the relationship of the bar and the Court. Therefore, I impose a sanction of reducing fifty (50%) percent of the allowed fee. *See, In Matter of Arlan's Department Stores, Inc.*, 615 F.2d 925 (2d Cir.1979).

The fee requested, $30,611 is accordingly reduced by the $1,550 ferreted out by the United States Trustee as duplicate billing and non-debtor work. WGM agreed to these deductions in their response of October 20, 1988. The fee is further reduced by the $17,900 received from this debtor though not applied to this debtor's charges, and it is further reduced by $3,061, the ten (10%) percent adjustment eliminating the minimum estimate of unnecessary work and time. That leaves a potential additional fee of $8,100 which, reduced by fifty (50%) percent, gives an allowable additional fee payable by the debtor, $4,050.

Counsel also seeks expenses of $1,600.80.

### Expenses

■■■■ The fee application should include a detailed list of expenses for which reimbursement is sought, including date, type and amount. *In re Wildman, supra,* at 731. The general principle governing reimbursement of expenses is that charges must have been necessary. *In re First Software Corporation,* 79 B.R. 108 (Bankr. D.Mass.1987). Expenses must be actual, not estimates. *In re Marsh,* 14 B.R. 615, 617 (Bankr.E.D.Va.1981); *Wildman, supra* at 731. Only actual out-of-pocket expenses will be reimbursed. *S.T.N. Enterprises, supra* at 835.

■■■■ The items listed on the expense portion of the fee application must bear a direct relation to the tasks described in the narrative and print-out portions of the application. Furthermore, the expenses themselves must be reasonable in the light of alternatives available and the marketplace. Costs which are part of the operating overhead are not properly chargeable to the estate. The reasonable hourly rate allowed to counsel takes into consideration the ordinary and usual cost of doing business. *First Software, supra* at 120. The expenses listed would seem to include overhead items such as telephone, $16.08; postage, $94.17; travel, $68.75. This was a Boston case with the restaurant in question on the State Street. However, at this stage, the amounts involved are small and would be a waste of the Court's and coun-

sel's time to request justification and consider them further in this case. Photocopy raises a recurring problem. A study conducted by the United States Trustee indicated that commercial photocopying can be done for under five cents a copy and less in volume. Yet, firms seek to charge several times that for in-house copying. A check with WGM revealed that they charge 20 cents per page for a total of $809.60, which is reduced by two-thirds, to $262.92. Costs are allowed at $1,054.12.