**In re John S. TRINSEY, Jr., Debtor.**

**Maurice W. BAEHR, Trustee, Plaintiff,**

**v.**

**James BEASLEY, Esquire and Robert Vedatsky, Esquire, Defendants.**

Bankruptcy No. 88–10694S.
Adv. No. 90–0608S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 7, 1990.

As Amended Jan. 7, 1991.

Maurice W. Baehr, Sr., Philadelphia, Pa., Trustee.

Stephen Raslavich, Philadelphia, Pa., for trustee.

David Zalesne, Philadelphia, Pa., for defendant Beasley.

Robert J. Vedatsky, Ocean City, N.J., pro se.

George B. Ditter, Ambler, Pa., for Gulph Woods.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant proceeding tests the ability of attorneys not appointed by this court to retain large fees paid to them by third parties working with the individual Debtor to maintain post-petition litigation on behalf of the Debtor's debtor-corporation. We hold that these fees are within the broad scope of "property of the estate" of the Debtor pursuant to 11 U.S.C. § 541(a)(7) and that they were expended "in connection with" the Debtor's case, pursuant to 11 U.S.C. § 329(a). Therefore, we conclude that the attorneys are only entitled to retain, pursuant to 11 U.S.C. § 329(b), the reasonable value of their services in light of the benefits received therefrom by the Debtor's estate, and that the Trustee of the Debtor's estate is entitled to utilize 11 U.S.C. § 549(a) to recover any excessive fees received. We will, however, refrain from entering any judgment in favor of the Trustee at this time in order to give the attorneys an additional opportunity to better explain and demonstrate the value of these services to the Debtor's estate because we recognize that the instant case presented an unusual, if not singular, factual pattern.

### B. HISTORY OF THE CASE

The instant proceeding arises out of the bizarre course of events surrounding the bankruptcy case of JOHN S. TRINSEY, JR., a/k/a Jack Trinsey ("the Debtor"). The history of this case can only be appreciated by review of our Opinion of April 11, 1988, in the case of a corporation owned by the Debtor which filed for bankruptcy on June 13, 1987, *In re Gulph Woods Corp.*, 84 B.R. 961 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989) (the corporate debtor is referred to hereinafter as "GWC" and this Opinion is referenced as *"GWC I"*). It would be a gross understatement to observe that the Debtor, who filed the underlying case of his own on March 2, 1988, did not gracefully accept that decision, granting GWC's principal secured creditor, Nassau Federal Savings and Loan Association ("Nassau"), now under the tutelage of the Resolution Trust Co. ("RTC"), relief from the automatic stay to foreclose on GWC's primary asset, a tract of land known as "Rebel Hill." Since that date, the Debtor has filed such a barrage of unsuccessful *pro se* pleadings and appeals that we can compare his undertaking to only that of the infamous Anthony R. Martin–Trigona. *See In re Gulph Woods Corp.*, 116 B.R. 423, 425 (Bankr.E.D.Pa. 1990) (*"GWC II"*), citing *In re Martin–Trigona*, 737 F.2d 1254, 1256–57 (2d Cir.1984).

The Debtor's own case has yielded two previously-published Opinions, *In re Trinsey*, 114 B.R. 86 (Bankr.E.D.Pa.1990) (*"Trinsey I"*), in which we denied the Debtor's discharge; and *In re Trinsey*, 115 B.R. 828, 829 (Bankr.E.D.Pa.1990) (*"Trinsey II"*), in which we refused an application of one Rania M. Major, Esquire, to be appointed "co-counsel" with the Debtor and have the Debtor's quixotic efforts funded by the GWC estate. Due largely to the increasingly-apparent inability of the Debtor to articulate any meaningful substantive basis to support his protestations of compliance with the most basic tenets of the Bankruptcy Code, we were compelled to convert both the GWC case and the Debtor's own case to Chapter 7 cases on August 17, 1989. The end of these cases appears in sight in light of our approval, on September 17, 1990, of a joint motion filed in the proceeding in issue in *GWC II* by the Trustees in both of these cases, the RTC, and various other interested parties, to approve a comprehensive settlement of virtually every outstanding matter in both of these cases. Predictably, the Debtor has filed a *pro se* appeal from that Order, and it may take some time until all of his various appeals are sorted out and disposed of in the court system.

The instant proceeding, filed by MAURICE W. BAEHR, the Trustee in the Debtor's case ("the Trustee"), on July 17, 1990, arises out of the Debtor's most expensive and elaborate effort to undo the effect of the decision in *GWC I.* On September 12, 1990, we denied the Defendants' motion to dismiss the Complaint, required the Defendants to answer by September 24, 1990, began the trial, and scheduled the completion of the trial on September 27, 1990. The facts, as established in the trial, which produced a voluminous record incorporating numerous depositions of other Trinsey-related legal events, are largely undisputed.

In late 1988 and early 1989, Defendant ROBERT VEDATSKY, ESQUIRE ("Vedatsky"), who was then associated with the law firm of Defendant JAMES BEASLEY, ESQUIRE ("Beasley") (collectively Vedatsky and Beasley are referenced as "the Defendants"), provided legal services to the Debtor in connection with a lender liability and RICO action filed against Nassau filed on February 8, 1989, in the United States District Court for the Eastern District of Pennsylvania at C.A. No. 89–1126 (the "RICO Action"). The named plaintiffs in the RICO Action were the Debtor, GWC, and Rebel Hill Builders, Inc., another Debtor-controlled entity.

It is also undisputed that the Defendants received total payments of $105,825 on account of services rendered by Vedatsky in the RICO Action between December, 1988, and February, 1989, without having been appointed as professionals pursuant to 11 U.S.C. § 327 or having been awarded compensation pursuant to 11 U.S.C. § 330. All of these payments were made to the Defendants by non-debtor third parties, Alan K. Kirsch ("Kirsch") and/or his associate, William Clarke ("Clarke") (Kirsch and Clarke are collectively referred to as "K & C").

K & C engaged in several attempts to purchase Rebel Hill from GWC's estate prior to a federal marshal's sale of that property by Nassau on July 19, 1989. This court denied a motion of a newly-formed corporation of theirs to purchase this property from the Debtor's estate on December 13, 1988, because of our conclusion that K & C had formulated numerous undisclosed "side" deals with the Debtor which rendered that scheme infeasible. *See Trinsey I,* 114 B.R. at 90. K & C then decided to pursue the goal of acquiring Rebel Hill by financing the Debtor's efforts to recover Rebel Hill, which amounted to total payments of $600,000. *Id.* at 87. The money paid by K & C to the Defendants was a substantial portion of that "investment." Clearly, it was not all or even most of it.[1]

Vedatsky testified and presented evidence via checks drawn to him alone that $36,000 of the funds paid by K & C were on account of services that Vedatsky had performed on the Debtor's behalf prior to his bankruptcy filing in late 1986 or early 1987, prior to Vedatsky's joining the Beasley law firm. This payment was made because Vedatsky insisted that this previous balance allegedly owing to him for work on behalf of the Debtor be liquidated before he embarked upon a further endeavor on the Debtor's behalf.

Despite Vedatsky's rather immodest recitation of his stature as a litigator of RICO actions, this action was totally unsuccessful. The primary thrust of the RICO Action was an attack upon Nassau's foreclosure judgment and an attempt to primarily enjoin the marshal's sale based upon it. On February 27, 1989, in a bench opinion delivered immediately after the hearing, the district court summarily denied the pre-

---

**1.** The Debtor's total inability to account for over $71,000 of these funds resulted in denial of his discharge. *Trinsey I,* 114 B.R. at 88, 89, 91–92. An additional $65,000 was paid by K & C to the firm of Jenkins, Tarquini, and Jenkins ("the Jenkins firm") on account of a past bill and to the Jenkins firm as consideration for that firm to enter its appearance as replacement counsel for the law firm of Pincus, Bressler, Hahn, Reich, and Weinberg ("the Pincus firm") in the *GWC* case. The Jenkins firm was the target of a separate adversary proceeding filed by the Trustee, at Adversary Number 90–0601S. That proceeding was settled by a Stipulation pursuant to which the Trustee is to receive thirty (30%) percent of any counsel fees ultimately awarded to the Jenkins form in the *GWC* case. *See* page 469 n. 3 *infra.* The Pincus firm was also paid a sum of about $25,000 on past due bills by K & C.

liminary injunctive relief sought. Vedatsky, although apparently still counsel of record for the plaintiff, so completely abandoned the action thereafter that he was uncertain of its status as of the trial date of the proceeding. Thus, despite Vedatsky's prodigious efforts—he attempted to review all of the Debtor's prior legal filings and allegedly expended over 370 hours, billed at the rate of $250/hour, during the month of February, 1989, alone (an average of over 13 hours each day of that month, including weekends!) in this undertaking—the RICO Action bore no fruit.

Clarke testified that he and Kirsch made the payments to the Defendants, as well as their other payments on the Debtor's behalf, as a means to the end of acquiring Rebel Hill. Clarke contradicted the Debtor's contention that the payments were a gift, but also stated that it was clearly intended that the Debtor would not repay these sums other than by bestowing upon K & C his favor and cooperation in their acquisition of Rebel Hill. Clarke also testified that he and Kirsch had ultimately accomplished their goal by acquiring Rebel Hill from the RTC after the marshal's sale for $7 million. Nassau had bid slightly over $8.8 million to acquire Rebel Hill at the July 19, 1989, marshal's sale, where it had encountered stiff bidding competition from one David Mermelstein. *See GWC II,* 116 B.R. at 425. Clarke stated that the RICO Action was not discussed as an issue in his ultimately-successful negotiations to purchase Rebel Hill from the RTC, and he indicated that the existence or promulgation of the RICO Action was therefore not a factor in K & C's acquisition of Rebel Hill. Clarke was nevertheless satisfied with the accomplishment of acquiring Rebel Hill, and he considered the sums paid to the Defendants as part of a successful investment in that undertaking.

Upon completion of the trial, the parties were accorded until October 24, 1990 (the Trustee), and November 13, 1990 (the Defendants), to submit trial briefs. The lack of disputed material facts causes us to present our decision in an Opinion in narrative form.

## C. DISCUSSION

### 1. THE PARTIES DO NOT DISPUTE THAT THIS PROCEEDING IS CORE AND THAT WE MUST DETERMINE IT.

The Trustee's allegation that this court has jurisdiction of this proceeding and that it is core in nature are admitted in the Defendants' Answer. Even if these pleadings did not in themselves confer jurisdiction upon this court to hear and determine this proceeding, *see In re St. Mary Hospital,* 117 B.R. 125, 131 (Bankr.E.D.Pa.1990), it is clear that this proceeding involves post-petition matters which relate to compensation of professionals, clearly a matter central to the administration of the Debtor's estate. *See* 28 U.S.C. § 157(b)(2)(A); and *In re 222 Liberty Associates,* 110 B.R. 196, 199–200 (Bankr.E.D.Pa.1990). Therefore, we are obliged to determine this proceeding as well as hear it.

### 2. ALL OF THE FUNDS PAID BY K & C ON THE DEBTOR'S BEHALF TO THE DEFENDANTS WERE "PROPERTY OF THE ESTATE" OF THE DEBTOR.

The Trustee's substantive bases for the instant proceeding are 11 U.S.C. §§ 549(a) and 329, which provide as follows:

**§ 549. Postpetition transactions**

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of *property of the estate—*

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

**§ 329. Debtor's transactions with attorneys**

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement

was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, *if the property transferred—*

(A) *would have been property of the estate;* or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12 or 13 of this title; or

(2) the entity that made such payment (emphasis added).

These Code sections thus establish that the Trustee can invoke § 549(a) to recover only "property of the estate" of the Debtor. Section 329 provides that only excess compensation which is "property of the estate" must be returned to the estate; otherwise, the excess compensation is remitted to the payor. It is therefore critically important to resolution of this proceeding to determine whether the funds paid by K & C to the Defendants on the Debtor's behalf are in fact classifiable as property of the Debtor's estate.

The Bankruptcy Code, at 11 U.S.C. § 541, defines "property of the estate" very broadly. This concept includes all legal or equitable interests in property which the Debtor has, as of the commencement of the case, 11 U.S.C. § 541(a)(1), and "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7).[2] No less authority than the United States Supreme Court in *United States v. Whiting Pools, Inc.*, 462 U.S. 198,

204–205, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), has stated, in accordance with "the House and Senate Reports on the Bankruptcy Code ... that § 541(a)(1)'s scope is broad." Consistent therewith, this court has adopted a very expansive definition that of the term "property of the estate." We have held that, even where a debtor has such a slight interest in property that another party is entitled to possession of that property, the property in issue may be "property of the estate." *In re CS Associates, United Jersey Bank v. CS Associates*, 121 B.R. 942, 960 (Bankr.E.D.Pa. 1990); *In re Temp–Way Corp.*, 80 B.R. 699, 702 (Bankr.E.D.Pa.1987). *See also In re Ford*, 78 B.R. 729, 735 (Bankr.E.D.Pa. 1987); and *In re Mason*, 69 B.R. 876, 882–84 (Bankr.E.D.Pa.1987).

It is undisputed that K & C paid Vedatsky solely for the purpose of instituting the RICO Action on the Debtor's behalf. Clarke testified that the motive behind the payments was to acquire the Rebel Hill property. Thus, it appears that K & C attempted to utilize the lawsuit as a bargaining chip against Nassau, who, not incoincidentally, also sought to obtain the property. From the Debtor's standpoint, not only did he receive "free" legal representation in the RICO Action, but, in addition, K & C paid his pre-petition debt of $36,000 owed to Vedatsky.

In support of his argument, the Trustee relies heavily upon *In re Land*, 116 B.R. 798 (D.Colo.1990), a case in which the brother of the debtor paid the majority of attorney fees incurred in connection with a civil action that the debtor initiated against a lender. The court found that the fees were paid from estate property, and agreed with the bankruptcy court's determination that the funds were advanced on behalf of

**2.** It also includes "[a]ny interest in property that the trustee recovers under section 329(b), ... of this title." 11 U.S.C. § 541(a)(3). Although this section references § 329(b), it is not pertinent to the issue before us because it relates to the disposition of recoveries under § 329(b) by the trustee after they are obtained by the trustee. Any other reading would be contrary to the terms of § 329(b), which clearly contemplates a

category of compensation payments which are not property of the estate. *See In re Hargis*, 887 F.2d 77, 79 (5th Cir.1989), *revised on reh'g*, 895 F.2d 1025 (5th Cir.1990) (payments to attorneys out of life insurance proceeds, which are specifically exempted from "property of the estate" § 541(a)(5)(C), are within the scope of § 329) (see discussion at page 468 *infra*).

the estate with an expectation of reimbursement. *Id.* at 805. The court concluded that this "indicates, if not established, a relationship or nexus, between the source of funds and the estate. There is a link, an evident relationship, between the funding agent and the property of the estate." *Id.*

The *Land* court distinguished its decision from that in *In re Boh! Ristorante, Inc.*, 99 B.R. 971, 973 (Bankr. 9th Cir.1989), where the post-petition payments of the debtor's attorney fees by its principal's former spouse were found to be a "gift," and thus were excluded from its estate.

The Defendants contend that the Debtor did not possess the requisite legal or equitable interest in the payment of the fees to allow them to be considered property of his estate. Moreover, the Defendants attempt to distinguish *Land* on the basis that K & C did not assert any claims for reimbursement of the payments made from the Debtor or his estate. The Defendants also assert, in contrast to *Land*, that K & C acted solely for their own financial benefit instead of that of the Debtor.

 Read together, *Land* and *Boh* indicate that whether a third-party payment constitutes a transfer of estate property depends on the motive of the funding agent. An expectation of reimbursement from the Debtor thus gives rise to the existence of a relationship between the funding agent and the estate property sufficiently close enough to link the fund to the estate. *See Land*, 116 B.R. at 808. In contrast, a gratuitous payment on the Debtor's behalf negates any inference of such a relationship. *See Boh*, 99 B.R. at 923.

 In the instant case, K & C's motives were quite clear: to expend any funds necessary to obtain Rebel Hill. There is no evidence on the record indicating that K & C would have sought reimbursement from the Debtor or his estate if the lender-liability action proved successful. However, it is equally clear that K & C did not intend to bestow a gift upon the Debtor, primarily because their testimony does not evince a purely donative intent. In essence, K & C used the Debtor's position as the owner of

Rebel Hill to further their personal interests in the property. This characterization of the funding scheme establishes, in our view, the requisite "nexus" or "relationship" between K & C and the estate to require classification of these funds as property of the Debtor's estate.

Thus, the facts of this case do not fall neatly into the analysis in either *Land* or *Boh* because here there is neither a "gift" nor an expectation of reimbursement by the funding agents. The evidence does indicate, however, that K & C furthered their own personal interests by funding the Debtor's interests in the RICO Action, which interests clearly are property of the Debtor's estate. *See Land*, 116 B.R. at 806 ("a debtor's pre-petition, tort-based claims against a lender are property of the estate"). This relationship between the Debtor's cause of action, the motives of K & C, and the estate constitute a sufficient "nexus" that the payments to the Defendants fall within the expansive scope of the term "property of the estate." Although K & C and Clarke did not seek financial reimbursement from the Debtor, it is the cause of action itself, which they hoped to use to their benefit, that is estate property. Thus, their conduct created a relationship with the estate because they were seeking some sort of gain from the lawsuit. This factor ties the estate and the funds together.

Although neither party argued the point, the question of whether the $36,000 of the fees which were paid to Vedatsky individually for legal expenses incurred in connection with his representation of the Debtor in 1986–87, and prior to either GWC's or the Debtor's bankruptcy filing, is "property of the estate" is a somewhat different and more difficult issue. Vedatsky's representation of the Debtor in the lender liability action was contingent on reimbursement of these fees, which K & C agreed to, and did, pay to him. In essence, these payments constituted a third-party's post-petition payment of the Debtor's pre-petition indebtedness to Vedatsky.

This set of circumstances is, in one sense, very much like that in those cases

which consider whether a payment by a third party directly to a creditor to pay a pre-petition obligation of the Debtor is a preferential payment. Under the so-called "earmarking doctrine," such a payment might be exempt from attack as a preference on the ground that the transfer did not diminish the assets of the estate. *See, e.g., New York City Shoes, Inc. v. Best Shoe Corp.,* 106 B.R. 58, 60–61 (E.D.Pa. 1989); *In re Price Chopper Supermarkets, Inc.,* 40 B.R. 816 (Bankr.S.D.Cal. 1984); and M. Pappone & T. Orson, *The Logic—and the Limits—of the Earmarking Defense,* 2 FAULKNER & GRAY'S BANKR.L.REV. 27 (No. 1, Spring, 1990).

However, we do not believe that the "earmarking doctrine" should be borrowed from the law of preferences and applied to the instant situation. It is clear that neither K & C nor Vedatsky nor the Debtor viewed the payment of the $36,000 on Vedatsky's prior fees any differently from the payment of the rest of the $105,825. There was no "earmarking" of the $36,000 in that sense. The payments to Vedatsky for prior services were part of a "package deal." The payment of the $36,000 was therefore not a remittance in payment on a pre-petition debt in isolation, but rather was a part of the consideration package that Vedatsky was to receive for the performance of his present services in prosecuting the RICO Action.

Thus, if we conclude, as we do, that the payment of any of the $105,825 is a disposition of "property of the estate," there is no reason to conclude that any portion of these similarly treated funds should be viewed any differently. We therefore decline to do so.

The Defendants rely heavily upon the initial decision in *Hargis, supra,* to support their argument that the payments in issue were not property of the Debtor's estate. In that case, a bankruptcy trustee sought to recover sums from the debtors' counsel which were paid, in consideration for prepetition services, out of part of the proceeds of a life insurance policy on the husband-debtor. 887 F.2d at 78. The court held that the proceeds in issue were exclud-

ed from the Debtors' estate on the basis of 11 U.S.C. § 541(a)(5)(C), which expressly exempts certain life insurance proceeds from the scope of property of the estate. *Id.* at 79. The court than determined that no general bankruptcy policy was disserved by the payment because it merely freed estate assets to pay other creditors. *Id.* The court therefore initially concluded that counsel was unconditionally entitled to the funds in issue. *Id.* at 79–80.

Upon a petition by the United States Trustee for a rehearing, asserting that the panel had overlooked the application of 11 U.S.C. § 329, the *Hargis* panel modified its decision in part. 895 F.2d at 1025–26. The court then found that § 329 required the bankruptcy court to review the issue of whether the services for which payment was made were related to the bankruptcy case. The court further noted that, if the services were related to the debtor's case, the bankruptcy court was obliged to determine whether the fees were reasonable. *Id.* at 1026. It therefore remanded the cause to the bankruptcy court to ascertain whether counsel's services were related to the case and to determine the reasonableness of the fees for those services that were so related. *Id.*

Clearly, the *Hargis* case is distinguishable from the instant case. The funds in question in the instant case were *not* the proceeds of a life insurance policy nor did they issue from any other specific source that would render them exempt from the broad sweep of § 541(a). Therefore, *Hargis* is of little help to the Defendants. In fact, the second *Hargis* decision is, in the last analysis, mainly indicative of the broad sweep of § 329, since it holds that court review is mandated even in the case of funds which *are* excluded from the scope of property of the estate. The first *Hargis* decision also suggests that a consideration of bankruptcy policy is appropriate in deciding the issue of whether certain proceeds are property of the estate. Therefore, a further discussion of the scope of § 329 and of bankruptcy policy implicated by the instant proceeding are required.

### 3. ALL OF THE FUNDS PAID BY K & C TO THE DEFENDANTS ON THE DEBTOR'S BEHALF WERE PAID "IN CONNECTION WITH" THE DEBTOR'S BANKRUPTCY.

Under 11 U.S.C. § 329(a), the court can only review the reasonableness of fees paid to a professional as compensation for those services rendered "in connection with" the debtor's bankruptcy case. Under § 329(b)(1)(A), the court, upon finding that the compensation exceeded the reasonable value of the services provided, may order the return of the excessive amount to the estate. Bankruptcy Rule ("B.Rule") 2017 implements § 329. *See In re Walters*, 868 F.2d 665, 667 (4th Cir.1989).

In *Walters*, the court interpreted § 329 and B.Rule 2017 broadly, holding that the debtors' civil suits filed against one of its creditors were a "way to gain bargaining power" from the creditor. *Id.* at 667. The court found that the fact that the debtors could have potentially reduced their indebtedness as a result of the lawsuits satisfied the requirement in B.Rule 2017(b) that the legal services be "in any way related to the [bankruptcy] case" as well as being incurred "in connection with" the case. *Id.*

Turning to the facts at hand, it is questionable who it was intended would be benefitted more by the RICO Action, the Debtor or K & C. Regardless, the RICO Action was clearly, from the Debtor's standpoint, an attempt to gain "bargaining power" from which he could benefit against Nassau in connection with his bankruptcy case. For this reason, following *Walters*, the requirements of § 329 and B.Rule 2017 are satisfied.

Certainly, the facts in *Hargis* were distinguishable. The *Hargis* court does not suggest that there was any connection whatsoever between the pre-petition services which had been paid off through the life insurance proceeds and the debtors' bankruptcy. However, the *Hargis* court ultimately remanded the matter to the bankruptcy court to finally resolve this issue. Here, the connection between the RICO Action and the Debtor's bankruptcy case is quite clear.

There is, again, a potential but unarticulated argument on Vedatsky's behalf that the $36,000 paid on the Debtor's pre-petition indebtedness can be distinguished from the remainder of the $105,825 payment. The services performed in 1986–87 were apparently not themselves rendered "in connection with" the Debtor's bankruptcy. However, we believe that the proper focus is what was the consideration for the payment of these services. As we noted at pages 467–468 *supra*, the payment of Vedatsky's pre-petition bill was part of a package deal between K & C, the Debtor, and Vedatsky. The payment of the $36,000 was therefore a part of the consideration for the services rendered by Vedatsky in the RICO Action. Hence, the payment of the $36,000, like the rest of the funds paid, was directly related to services rendered in connection with this case.[3]

### 4. BANKRUPTCY POLICY SUPPORTS THE TRUSTEE'S RECOVERY OF THE PARTICULAR PAYMENTS IN ISSUE FROM THE DEFENDANTS.

The *Hargis* court suggested that a significant factor in its initial decision was the conclusion that its result was consistent with bankruptcy policy. Specifically, it found that the payment of the fees of the debtors' counsel in question benefitted the

---

**3.** This conclusion may have had adverse repercussions for the Jenkins firm in the ultimate conclusion of the issues raised in Adversary No. 90–0601S. *See* page 464 n. 1, *supra*. The payment of the $65,000 to them was clearly at least in part in consideration for services rendered in connection with the instant case, *i.e.*, their representation of the Debtor's corporation, GWC, in the future. We also surmise that the failure of the Jenkins firm to timely disclose its full compensation arrangement, upon the court's ques-

tioning of counsel at the outset of its engagement as GWC's representative, is violative of the Code and several B.Rules. *See* 11 U.S.C. § 329; B.Rule 2014(a); B.Rule 2016(b); B.Rule 2017(a), (b). This factor could adversely impact any of their future requests for compensation in the GWC case. *See, e.g., In re Arlan's Dep't Stores, Inc.*, 615 F.2d 925, 943–44 (2d Cir.1979); and *In re New England Caterers, Inc.*, 115 B.R. 724, 730–31 (Bankr.D.Mass.1990).

estate, because it liquidated an obligation to a creditor with funds not available to other creditors. It is difficult to see how that argument could be made here, and how any bankruptcy policy is served by any result other than a directive that the Trustee has a right to recover all of the funds in issue from the Defendants which were not reasonably directed towards the benefit of the Debtor's estate.

There is a firm bankruptcy policy that a debtor must obtain court approval before a debtor may borrow money or use property of the estate out of the ordinary course of business. 11 U.S.C. §§ 364(b), (c), (d), 363(b)(1). *See Trinsey I*, 114 B.R. at 87, 91. For a debtor to argue, like the Debtor did here, that he could obtain over $600,000 in funds from third parties, such as K & C, and use these funds as he wished, without the knowledge or approval of his creditors, the United States Trustee, or the court violates the most basic tenets of bankruptcy policy. The Debtor's claim of a right to unilaterally fund a legal action which may well have been a detriment rather than a benefit to the estate, simply because he had no definite commitment to repay K & C for funding same, makes a mockery of the requirements of the Code that court approval for any significant undertakings out of a debtor's ordinary course of business is required. Nor is it even the least bit convincing for the Debtor to argue that such payments are the equivalent of a gift because no direct obligation to repay these funds to K & C attached. There are almost always some business purpose "strings" attached to a third party's beneficence, as was the case here. Therefore, *any* transaction, even one which the debtor views as totally benign, must be put before the interested parties, the United States Trustee, and the court for scrutiny and approved by the court *before* it is effected and funded.

Similarly, any professional dealing with a debtor is duty-bound to determine whether court approval or at least a disclosure to the court is necessary whenever accepting any funds in any way related to the debtor's case. The professional may be required to make a disclosure to the court under § 329 even if no appointment is nec-

essary. If the professional fails to perform either of these duties, ignorance cannot be a defense, unless the court wishes to promulgate a policy of promoting ignorance.

The instant factual pattern was, moreover, not a hypothetical situation involving the mere *appearance* of an impropriety, but a gross example of the abuses which can result if the foregoing bankruptcy principles are ignored. The Debtor here was a party well-known to be in bankruptcy and well-known for questionable judgment. The engagement of Vedatsky, as Vedatsky himself must have known only too well from his many hours sorting through all of the Debtor's legal actions, was directly related to the bankruptcies of GWC and the Debtor. Vedatsky's review of these actions should have confirmed any lingering doubts that he may have had about the Debtor's motivations and capacity for clear judgment. However, payment of large sums of money can cause prudence to fly out of the window. The sum involved was large. The Defendants accepted same without even an attempt to put the question of their propriety to do so before this court or disclose their activities to the court.

It must have been clear to Vedatsky and to the Debtor that K & C were not playing the role of fairy godfathers. Their motivations were clearly selfish and directed to their own betterment in their long-range business plan to acquire Rebel Hill.

As the Defendants themselves reiterate in their Brief, it would be unconscionable to compel them to return the funds paid to them to K & C. This argument is apparently made by the Defendants to suggest their own equities to retain the payments are greater than those of K & C to recover them. However, if we were to accept the Defendants' argument that the payments in issue were not property of the estate and we were to find that the compensation exceeded the reasonable value of the services performed, return of the funds to K & C is exactly the result that § 329(b)(2) would mandate.

We agree that K & C should in no event recover these payments. To their credit,

they have never hidden their motives in making these payments from this court. And they have never so much as hinted that the funds should be repaid to them. They properly view the payments as part of their ultimately-successful investment to acquire Rebel Hill. However, we believe that the fact that return to K & C is such a distasteful alternative is merely one more reason why these funds should be deemed to be property of the Debtor's estate.

We certainly cannot say, as the *Hargis* court did, that the payment of Vedatsky's pre-petition debt by K & C was an unmitigated windfall to the Debtor's estate. K & C apparently had more than $600,000 which they were prepared to invest in this phase of their plan to acquire Rebel Hill. Rebel Hill was clearly the most valuable property of GWC's estate. The payments made to the Debtor were made because of K & C's perception that the prosecution of the RICO Action, among other activities of the Debtor, would benefit their goal of acquiring Rebel Hill. The Debtor's relationship to Rebel Hill was, therefore, an asset of the Debtor's estate which the Debtor was offering to K & C. The misuse of the proceeds of this asset, to the tune of over $600,000, appears to have resulted in a substantial loss to the Debtor's estate. Certainly, the elimination of Vedatsky's debt of $36,000 to the estate pales in comparison to the squandering of this $600,000 asset on the Debtor's pet projects.

We therefore conclude that the entire sequence of events here constituted a gross attempt on the part of the Debtor to circumvent the bankruptcy process and convert assets of his estate into use on his own personal projects which did not benefit his estate. The Defendant's failure to obtain appointment or disclose their activities aided this conduct of the Debtor. Bankruptcy policy cannot tolerate such conduct.

5. SECTION 549(a) OF THE BANKRUPTCY CODE IS THE APPROPRIATE BASIS FOR THE TRUSTEE'S CAUSE OF ACTION, EVEN IF HIS CLAIM IS DERIVED FROM § 329.

The Defendants have questioned the Trustee's invocation of § 549(a) as his sub-

stantive basis for recovery, suggesting that § 329, which the Trustee fails to cite in his Complaint, is the only Code section under which the Trustee has a cause of action. We do not view § 549(a) and § 329 as reciting two separate substantive bases for recovery. Rather, § 329 recites the standards for bankruptcy court review of a debtor's transactions with attorneys, without providing any remedy for recovery of compensation improperly paid. On the other hand, § 549(a) does not provide any standards for recovery of compensation improperly paid to attorneys. Instead, it provides the remedy by which a trustee may recover any sums which have been improperly paid, post-petition under § 329 or otherwise. In fact, with respect to recovery of improper post-petition payments to professionals, § 549 constitutes the exclusive remedy of the Trustee. *See In re 31–33 Corp.*, 100 B.R. 744, 747 (Bankr.E.D.Pa.1989).

Therefore, we conclude that the Trustee's invocation of § 549(a) as his basis for recovery was totally proper. It is true that the Trustee, in his pleadings, did not specifically cite § 329. However, it was clear, both before the trial and in the course of briefing thereafter, that the Trustee was relying on this Code section. Therefore, we find no prejudice to the Defendants by reason of this omission.

6. DESPITE OUR CONCLUSION THAT THE TRUSTEE IS ENTITLED TO RECOVER EXCESSIVE COMPENSATION FROM THE DEFENDANTS, WE ARE WILLING TO GIVE THE DEFENDANTS A FURTHER OPPORTUNITY TO ESTABLISH THAT THE COMPENSATION PAID TO THEM WAS "REASONABLE," *I.E.*, THAT THE PAYMENTS WERE JUSTIFIED IN LIGHT OF THE BENEFIT TO THE DEBTOR'S ESTATE FROM THESE SERVICES.

Having concluded that the Defendants' recovery of compensation from K & C on the Debtor's behalf is in fact subject to

court scrutiny, and that any excessive sums received are recoverable by the Trustee, we must nevertheless express some sympathy for the position in which the Defendants find themselves. The transactions in which this particular Debtor became involved were indeed extraordinary and hopefully are unparalleled in the history of bankruptcy. The authorities relating to a third-party's compensation of attorneys are few in number and the guideposts included there in are not totally clear. Although we cannot credit the Defendants for failing to obtain bankruptcy court guidance, or for failing to at least disclose their relationship with the Debtor to this court, given the clarity of the relationship of the services performed to two infamous bankruptcies and the magnitude of the sums involved, their conduct was not totally inexplicable and their motives were quite possibly pure. The Defendants never knew for sure, until the publication of this Opinion, that they were susceptible to court scrutiny of the compensation for their services.

In light of the foregoing, and to overcome any impression· on the part of the Defendants that we are not prepared to give them a full opportunity to articulate the magnitude of the services provided and their benefit to the Debtor's estate, we have decided to accord the Defendants a short period to supplement their submissions already in the record to convince us that they are in fact entitled to retain at least some of the compensation received because it was reasonable in light of the benefits which these services conferred upon the Debtor's estate. We will then allow the Trustee and the United States Trustee a period for comment, after which we will provide our own analysis of its submissions. *See, e.g., In re J.A. & L.C. Brown Co.*, 75 B.R. 539, 539–40 (E.D.Pa. 1987).

■ We think it is important to set down some standards for measuring the reasonableness of the Defendant's compensation. We believe that the proper standards are those set down for measuring the compensation of a counsel for a Chapter 7 debtor in *Trinsey II*. Like counsel for such a debtor, 115 B.R. at 831–32, an attorney who is compensated by a third party need not receive appointment from the court prior to engaging in services on behalf of the debtor. *See Boh, supra*, 99 B.R. at 972–73. Therefore, the failure to obtain prior court approval does not preclude the Defendants from retention of the sums paid. However, compensation may be retained, upon a challenge based upon §§ 549(a), 329, only where counsel is able to establish, under a standard of strict court scrutiny, that the services performed actually benefitted the debtor's estate. *See, e.g., In re Designaire Modular Home Corp.*, 517 F.2d 1015, 1018–19 (3d Cir.1975); *In re Hydrocarbon Chemicals, Inc.*, 411 F.2d 201 (3d Cir.1968); *Boh, supra*, 99 B.R. at 973–74; and *Trinsey II, supra*, 115 B.R. at 834–36.

We do note that the Defendants must adhere strictly to the procedural guidelines for submission of any application to obtain or retain property of the estate of a debtor as the source of compensation set forth in, *e.g., In re Meade Land & Development Co.*, 527 F.2d 280, 283–84 (3d Cir.1975); *In re Metro Transportation Co.*, 78 B.R. 416, 418–20 (Bankr.E.D.Pa.1987); *aff'd in part & remanded in part*, 107 B.R. 50 (E.D.Pa. 1989); *In re Mayflower Associates*, 78 B.R. 41, 47–48 (Bankr.E.D.Pa.1987); and *In re Shaffer–Gordon Associates*, 68 B.R. 344, 347–51 (Bankr.E.D.Pa.1986). We suggest that they re-examine their submissions already in the record—a recitation of "Services Rendered" and a "Supplemental Certification" remitted by Vedatsky—in light of these authorities. The entries on the "Services Rendered" have frequently "lumped" different services performed together and inadequately described those services. *See Meade Land, supra*, 527 F.2d at 283–84; and *Metro Transportation, supra*, 78 B.R. at 418. An hourly rate in excess of the $225/hour maximum which we generally presently allow is requested. *Compare Shaffer–Gordon, supra*, 68 B.R. at 350–51. Several of the costs for which reimbursement is sought do not adhere to the guidelines set forth in detail in *Metro Transportation, supra*, 78 B.R. at 420; and *Mayflower, supra*, 78 B.R. at 47–48.

Of course, on a larger scale, the Defendants should carefully analyze in what manner, if any, their services benefitted the Debtor's estate and how they did so. It should be kept in mind that it is not the interest of the Debtor and his visionary enterprises, nor the interest of K & C, who probably will not file proofs of claim as creditors, which must be measured. Rather, it is the interests of the numerous other creditors of the Debtor who have filed proofs of claim the total amount of which we suspect greatly exceeds the $105,825 paid to the Defendants whose interests are in issue. We confess that we are skeptical as to whether the Defendants can indeed establish to the satisfaction of this court that the Debtor's or GWC's estates benefitted from the prosecution of the RICO Action. Consequently, we urge the Defendants to carefully consider this issue before making a lengthy submission in conformity with the requisite procedural requirements which will not be substantively capable of result in any recovery on their behalf. They may gracefully agree to voluntarily return at least a significant portion of the fees retained, and all interested parties and the court could conceivably approve such a resolution.

We do not consider ourselves being unfair to the Defendants in allowing them to make only written supplementary submissions. It is not required that we extend a hearing to any party on a fee application request, *see Blum v. Witco Chemical Corp.*, 829 F.2d 367, 377–78 (3d Cir.1987), and it is necessary, in the bankruptcy context, that we require applicants to satisfy their burdens of proof in their submissions without allowing encroachments on valuable court-hearing time to fill the gaps in adequate applications with testimony at hearings. *See, e.g., Metro Transportation, supra*, 107 B.R. at 54; *In re Pothoven*, 84 B.R. 579, 582–83 (Bankr.S.D.Iowa 1988); and *In re Pettibone Corp.*, 74 B.R. 293, 300 (Bankr.N.D.Ill.1987). The Defendants, of course, already had one opportunity, in the trial of September 27, 1990, to present testimony relevant to the propriety of their fee requests to this court.

## D. CONCLUSION

For the reasons stated herein, the only Order which we will enter at this time is a directive regarding the filing of supplements to the Defendants' present submissions supporting their receipt of the compensation received by them from K & C on behalf of the Debtor and the opportunity of the Trustee and the United States Trustee to respond thereto.

## ORDER

AND NOW, this 7th day of January, 1991, upon the failure of the Defendants to offer any supplemental post-trial submissions to the court on or before December 24, 1990, as permitted in our Order of December 7, 1990, and finding that the Defendants have failed to meet their burden of proving that any of the payments of $105,-825 received by them were for services which provided any benefit to the Debtor's estate under the standards set forth in the Opinion accompanying that Order, at 472–473, and accepting the Defendants' averment that $36,000 of the sums in issue were paid to Defendant ROBERT VEDATSKY, ESQUIRE ("Vedatsky") for services which were performed by Vedatsky for the Debtor pre-petition, before he joined the firm of Defendant JAMES BEASLEY, ESQUIRE ("Beasley"), it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff, MAURICE W. BAEHR, TRUSTEE ("the Plaintiff"), and against Vedatsky only in the amount of $36,000.00.

2. Judgment is entered in favor of the Plaintiff and against Beasley and Vedatsky, jointly and severally, in the amount of $69,825.00.

3. The Opinion of December 7, 1990, is amended.